**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
*******************************
DISCOUNT VIDEO CENTER, INC.
     Plaintiff


vs.                              Civil No. 1:12-cv-10805-NMG


DOES 1 - 29
     Defendants
*******************************
PATRICK COLLINS, INC.,
     Plaintiff


vs.                              Civil No. 1:12-cv-10532-GAO


DOES 1 -79
     Defendants
*******************************
PATRICK COLLINS, INC.,
     Plaintiff


vs.                              Civil No. 1:12-cv-10758-GAO


DOES 1-36
     Defendants
*******************************
TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES CHIEF MAGISTRATE JUDGE
AT BOSTON, MASSACHUSETTS
ON OCTOBER 12, 2012


APPEARANCES:
For the plaintiffs:  Marvin N. Cable, Esq.
                     Law Offices of Marvin Cable
                     P.O. Box 1630
                     Northampton, MA 01061
                     413-268-6500
                     law@marvincable.com

For the defendant:   Samual Perkins, Esq.
John Doe 22          Brody, Hardoon, Perkins &
12-cv-10805          Kesten, LLP
                     One Exeter Plaza, 12th Floor
                     Boston, MA  02116
                     617-880-7100
                     sperkins@bhpklaw.com


*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

```
1      For the defendant:    Jason E. Sweet, Esq.
       John Doe 21           Booth Sweet LLP
2      12-cv-10532           32R Essex Street
                             Cambridge, MA 02139
3                            617-250-8619
                             jsweet@boothsweet.com
4
       For the defendant:    Daniel G. Booth, Esq.
5      John Doe 69           Booth Sweet LLP
       12-cv-10532           32R Essex Street
6                            Cambridge, MA 02139
                             617-250-8629
7                            dbooth@boothsweet.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      Court Reporter:

24      Proceedings recorded by electronic sound recording,
        transcript produced by transcription service.
25
```

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

 1  COURT CALLED INTO SESSION

 2  (10:02:29 a.m.)

 3          THE CLERK:  The case of <u>Patrick Collins v. Does</u>

 4  <u>1-36</u>, 12-10758, 12-10532; and <u>Discount Video v. Does 1-29</u>,

 5  12-10805 will now be heard before this Court.

 6          Counsel, please identify themselves for the

 7  record.

 8          MR. PERKINS:  Good morning, Your Honor.  I'm Sam

 9  Perkins here representing Doe 22 and Discount Video.

10          MR. SWEET:  Jason Sweet representing Doe 21 in

11  Patrick Collins.

12          MR. BOOTH:  Dan Booth from Booth Sweet

13  representing Doe 69 in Patrick Collins.

14          MR. CABLE:  Marvin Cable, attorney for the

15  plaintiffs.

16          THE COURT:  So what happened, Mr. Cable, on

17  Friday?  I thought like a young computer-savvy guy like you

18  with your --

19          MR. CABLE:  Yes.

20          THE COURT:  -- fancy laptop would have a Smart

21  Phone, iPad, iPhone.  You'd be looking at your email every

22  four minutes.

23          MR. CABLE:  Yeah, I do.  Usually when I see a

24  hearing come through, I didn't -- you know, I don't think

25  it's going to be that next day or a couple of days after, so

1  I let it pass and then come back to it at the end of the

2  week.  It was an overlook, and I apologize.  I apologize for

3  not having giving a call.

4          THE COURT:  All right.  So my suggestion to you --

5          I can tell from your demeanor today and also the

6  other time you were in front of me is it's not intentional,

7  that you take seriously your responsibility.

8          But you have to look at your email.  You have to

9  read the emails from the Court every day, --

10          MR. CABLE:  Right.

11          THE COURT:  -- because we're more nimble than you

12  think.  And so there are times when we'll schedule hearings

13  quickly depending on the circumstances, and you can't really

14  wait a week at a time to look and see what's what.

15  Especially in the situation you're in where you have a lot

16  of cases and a busy federal practice at this point.

17          MR. CABLE:  Right.

18          THE COURT:  And you need to be on top of those

19  cases and checking those emails every day when they come out

20  from the Court to see.  Or even, you know, potentially

21  emails that come from the Court as filings, not just the

22  Court's filings but filings from the parties, because it's

23  certainly possible that people would file emergency motions.

24  And sometimes lawyers file more emergency motions than there

25  are emergencies; but nonetheless, you need to be on top of

1 that in case somebody asks for a quick relief for a motion,

2 so you need to look at them.

3          MR. CABLE:  I apologize.

4          THE COURT:  All right.  So now is it your practice

5 to look at those every day?

6          MR. CABLE:  Yes, it is.

7          THE COURT:  Okay, good.  All right.

8          So I have a number of questions.  You had some

9 flavor of them from the electronic order --

10          MR. CABLE:  Right.

11          THE COURT:  -- setting up for the hearing, so I'll

12 hear from you first as to that.

13          MR. CABLE:  Sure.  You had asked two questions:

14 Basically what information we have, and what we need.

15          Information we have.  We have the time stamp and

16 the IP address, so we have the IP address that was

17 identified in downloading or uploading --

18          THE COURT:  So see if I can -- let me just see if

19 I understand exactly what the forensics showed.

20          MR. CABLE:  Okay.

21          THE COURT:  And if I'm wrong -- and I could be

22 wrong, so please correct me.

23          Essentially, your forensics people went into an

24 existing BitTorrent swarm.

25          MR. CABLE:  Uh-huh.

1          THE COURT:  Joined the swarm, so to speak.  When

2 they joined the swarm, they can see movies that are

3 available.  They see -- they draw in a particular swarm that

4 has a particular movie available to it.  Right?

5          MR. CABLE:  Correct.

6          THE COURT:  So they've looked in the client for --

7 searched for "XYZ" movie, okay?  And they eventually call it

8 "XXX" movie, and they search for "XXX," and they see it, and

9 it may be available on more than one swarm possibly.  Right?

10          MR. CABLE:  Uh-huh.

11          THE COURT:  And they pick for our purposes one

12 swarm where that movie is.

13          MR. CABLE:  Uh-huh.

14          THE COURT:  And then essentially the forensic

15 person downloads that movie to his or her computer.

16          MR. CABLE:  Correct.

17          THE COURT:  And in the course of doing that,

18 they're able to identify those computers that actually

19 uploaded it to them, or --

20          MR. CABLE:  Yes.

21          THE COURT:  -- those computers that actually

22 uploaded it to them.

23          MR. CABLE:  Right.  If that person's inactive; in

24 that, they're not uploading but they have -- they're in part

25 of the swarm, we don't identify them as -- in the complaint.

1          THE COURT:  So it's possible that somebody would

2 have that movie "Triple X" on their computer.

3          MR. CABLE:  Correct.

4          THE COURT:  Their computer is on at the moment

5 that your forensic investigator's in the swarm.

6          The BitTorrent client is active on that other

7 person's computer, but for however BitTorrent works, your

8 forensic person didn't get any portion of his or her copy of

9 the movie from that particular person.

10          MR. CABLE:  Right.

11          THE COURT:  And in that circumstance that person

12 wouldn't be listed on Exhibit A.

13          MR. CABLE:  Correct.  And that is different from

14 other forensic people around the country, so other forensics

15 people in other cases -- similar cases might say that they

16 are part of the complaint.

17          THE COURT:  I see.  All right.  So some cases I

18 read about there might be circumstances where that person is

19 part of the Exhibit A, so to speak.

20          MR. CABLE:  Correct.  Correct.

21          THE COURT:  All right.  So your Exhibit A lists

22 those IP addresses from which your forensic person obtained

23 at least part of the particular movie named in the

24 complaint.

25          MR. CABLE:  Right.  And that at least is a filter.

1 So there's a certain amount that we have to get or that the

2 computer program says, okay, we have this amount.  Okay, now

3 we're going to mark them part of Exhibit A.

4          THE COURT:  So if the movie just by way of example

5 for 124 bytes --

6          MR. CABLE:  Uh-huh.

7          THE COURT:  -- of information to download the

8 whole movie, if somebody gave you one byte, they might not

9 make the threshold.

10          MR. CABLE:  Correct.

11          THE COURT:  If they gave you a certain portion,

12 percentage, it's at that point that you would put them in.

13          MR. CABLE:  That's correct.

14          THE COURT:  Now, is there any way for you to know

15 --

16          The conclusion that they have the entire file on

17 their computer rests upon the fact that it's listed in

18 BitTorrent.

19          MR. CABLE:  There's some meta information that's

20 given.  So besides the IP address, it says how much of that

21 file they have.  So let's say they have a hundred percent or

22 they have 60 percent.

23          THE COURT:  So by the nature of the way BitTorrent

24 works, it's sending over to you metadata that's telling you

25 what percentage of the file they have.

1          MR. CABLE:  Exactly.

2          THE COURT:  Is it that metadata that you look to

3 to determine whether to put them in Exhibit A?

4          MR. CABLE:  Sometimes.  It's not conclusive.  So

5 if there's somebody that's going to have 30 percent, we may

6 not put them in the complaint.  If there is someone who has

7 a hundred percent, yes, almost absolutely.  If somebody has

8 80 percent, we may; we may not.

9          THE COURT:  What would that determination rest

10 upon?

11         MR. CABLE:  The clients.

12         THE COURT:  So some clients might want to have a

13 lower or higher threshold.

14         MR. CABLE:  Correct.

15         THE COURT:  I see.

16         And so it's not correct to say that the metadata

17 reveals that everybody in Exhibit A has a hundred percent.

18         MR. CABLE:  That's correct, but a substantial

19 majority do.

20         THE COURT:  Okay.

21         MR. CABLE:  I would say if I had to make a guess

22 -- and it's not good to make guesses.  -- I would say it's

23 more than three quarters.

24         THE COURT:  In each of the three cases.

25         MR. CABLE:  Yes.  Well over.  I mean, there's some

1 that have almost a hundred percent.  A hundred percent.  A

2 hundred percent of the movie.

3          THE COURT:  I see.  All right.  So when you get to

4 the download, you obtain the IP address of the computer or

5 computer -- you obtain the IP address of the computer or

6 computers --

7          MR. CABLE:  Uh-huh.

8          THE COURT:  -- that uploaded the movie to your

9 forensic --

10          MR. CABLE:  Correct.

11          THE COURT:  -- computer.

12          MR. CABLE:  Uh-huh.

13          THE COURT:  And that IP address is essentially the

14 address of the router, not the address of the device

15 connected to the router.

16          MR. CABLE:  To the modem.

17          THE COURT:  To the modem.

18          MR. CABLE:  Because there could be multiple

19 routers.

20          THE COURT:  All right.  So that's the modem, so

21 that's essentially the modem from Verizon, --

22          MR. CABLE:  That's correct.

23          THE COURT:  -- Comcast or the like.

24          MR. CABLE:  And there can be a modem that is a

25 router at the same time, so there can be a combined --

1            THE COURT:  All right.  But in any event, it's the

2    address of the modem.  But it doesn't give you --

3            If there's multiple devices connected to that

4    modem either because it's a combined modem/router or through

5    another -- through one or more routers connected to that

6    modem, it doesn't let you -- the IP address doesn't let you

7    distinguish between them.

8            MR. CABLE:  That's correct.

9            THE COURT:  Now, the metadata that you get gives

10   you --

11           What comes across in the metadata?  One thing that

12   comes across in the metadata is the percent of the file --

13           MR. CABLE:  Right.

14           THE COURT:  -- that the sending computer has.

15           MR. CABLE:  Right.  Also the hash mark which is

16   the identifier of that file, also the file name, the file

17   size.

18           And from what I understand that's it.  There could

19   be more.  I'm not the technical expert as to what -- how the

20   computer software works, but that's from what I see --

21           From my clients and from the forensic team, that's

22   what I see.

23           THE COURT:  All right.  And so you're not aware of

24   the metadata giving you any device-specific identifying

25   information.

1            MR. CABLE:  No.

2            THE COURT:  Do you know whether that's obtainable

3  or not?

4            MR. CABLE:  We can get the MAC address from the

5  ISP to see -- to confirm that that -- to confirm that the

6  download came from that modem, because people can scoop IP

7  addresses.

8            So if we, for example, get --

9            If we subpoena the ISP for an IP address, the

10 person/owner of the IP address, that IP address actually

11 could have been spoofed and be somebody else.  So when we

12 get --

13           THE COURT:  The IP address, not the one from

14 Verizon, but the one you got from the metadata.

15           MR. CABLE:  Right.  It could actually be someone

16 in Alaska or wherever, and so to confirm that it's actually

17 that modem we ask for the MAC address, so --

18           THE COURT:  So when you're asking in the subpoena

19 for the MAC address, you're asking for the MAC address of

20 the modem.

21           MR. CABLE:  The modem.  That's correct.

22           THE COURT:  But how will that -- if you don't have

23 the MAC address of the modem you got it from, how does that

24 confirm anything?

25           MR. CABLE:  We -- we -- that's as far as we can go

1 at this point, and I think you hit the crux of the issue.

2          THE COURT:  So one of my questions was and --

3          What does obtaining the MAC address from the ISP

4 help you determine?

5          MR. CABLE:  It determines that that IP address --

6 that the owner of the IP -- or the owner of the IP address

7 that we get from the ISP is the same person, so Person X --

8 Person X --

9          THE COURT:  I'm confused.  You have it -- you down

10 --

11          Your forensic person downloads this movie.  Okay?

12 You have an IP address --

13          MR. CABLE:  Uh-huh.

14          THE COURT:  -- from that download.  You now

15 subpoena -- you look up on the Internet who owns that IP

16 address at Verizon.

17          MR. CABLE:  Right.

18          THE COURT:  Right?  So then you come to me, and

19 you say, "Let us subpoena Verizon for that IP address."

20          MR. CABLE:  Uh-huh.

21          THE COURT:  For the owner, the various information

22 of that.

23          MR. CABLE:  Right.

24          THE COURT:  Verizon says, "We own that IP

25 address."

1          And let's say there's no objections, and I allowed

2 it and so forth, and you get back the name and the address

3 of the person who subscribed to that IP address on January

4 12 --

5          MR. CABLE:  Right.

6          THE COURT:  -- which was the day you did this.

7          MR. CABLE:  Uh-huh.

8          THE COURT:  And you get the MAC number of that

9 subscriber's modem on that day.

10         MR. CABLE:  Uh-huh.

11         THE COURT:  That's what you're asking for.  Right?

12         MR. CABLE:  Right.

13         THE COURT:  And you get that from Verizon.

14         How does that -- what does that tell you about

15 whether or not the IP address you got on January 12 from the

16 download is the -- was actually the subscriber's IP address?

17         MR. CABLE:  From what I understand, if a forensic

18 expert were to go in and examine the devices at the home,

19 they would check the MAC address of the device, and they'd

20 confirm that that modem was the modem that did the download.

21         THE COURT:  Well, they could confirm that the -

22         If the person still has Verizon service and still

23 has the same modem and didn't swap it out, they could

24 confirm that the modem in the house is the one that Verizon

25 told them about, but how would they confirm that it wasn't

1   somebody in the Ukraine spoofing?

2          MR. CABLE:  I don't know.  I'm not the technical

3   expert.  That's what I'm told that the forensic expert needs

4   to confirm the --

5          THE COURT:  That the download --

6          MR. CABLE:  -- occurred there, right.

7          THE COURT:  The question I'm wondering then is --

8          Maybe I'm being too concrete, but I would think

9   that in order to confirm that the sending computer actually

10  used that IP address as opposed to spoofed it, --

11         MR. CABLE:  Uh-huh.

12         THE COURT:  -- you would require -- you'd need to

13  know the metadata, the MAC address of the modem.  Then if

14  they didn't spoof that, --

15         MR. CABLE:  Right.

16         THE COURT:  -- then you would know -- you'd have

17  two sides.

18         MR. CABLE:  Yes, that would be the better.

19         But from what I understand getting the MAC address

20  is helping in building a case.  I'm not sure exactly which

21  situation --

22         THE COURT:  So my question is this.  Is it helpful

23  in discovery in the merits of the case, --

24         MR. CABLE:  Yes.

25         THE COURT:  -- or is it helpful in identifying

1  sufficiently the infringer such that you can amend your

2  complaint?

3          MR. CABLE:  Not -- not for amending the complaint,

4  no.  For the merits of the case.

5          THE COURT:  Okay.  So you don't need the MAC

6  address in order to identify the subscriber.  The infringer,

7  rather.

8          MR. CABLE:  I'm told I need it by our forensic

9  guy, but I am unclear as of now.  I can probably get back to

10 you and have that response to you.

11         THE COURT:  Okay.  So how do you --

12         Putting the MAC aside, assuming that that doesn't

13 --

14         It sounds like it won't specifically identify the

15 infringer, because it doesn't sound like you obtained --

16         MR. CABLE:  Right.

17         THE COURT:  -- in the metadata the MAC address of

18 the sending device.

19         MR. CABLE:  Correct.

20         THE COURT:  So it sounds to me -- just a summary

21 --

22         What you know at the time you filed the complaint

23 is the IP address of the sending computer.

24         MR. CABLE:  Uh-huh.

25         THE COURT:  Sorry.  The IP address that sending

1 computer seemingly used when it uploaded the movie to your

2 forensic person who downloaded it.

3          MR. CABLE:  Uh-huh.

4          THE COURT:  And from the metadata that BitTorrent

5 supplies --

6          MR. CABLE:  Yes.

7          THE COURT:  -- the percent of the file the sender

8 has, the hash mark on the file which is just another way of

9 identifying the file really, the file name, and the file

10 size, and no device-specific information.

11          MR. CABLE:  That's correct.

12          But we can also make inferences from the IP

13 address, too.  So we can put the IP address into a database,

14 and it's not totally accurate, but we can see which city

15 they might live in -- or which city the download had

16 occurred.  We might be able to tell the longitude and

17 latitude.

18          Now, there's a center deviation of a couple miles,

19 so it's not totally accurate, but this also helps us

20 determine that this person is in the district.

21          THE COURT:  Right.  Okay.  So from the IP address

22 you can simply gather information that helps you both

23 determine the name of the ISP --

24          MR. CABLE:  Yes.

25          THE COURT:  -- and the venue.

1          MR. CABLE:  And again, that's -- there's a

2   standard deviation of a couple miles.  So if somebody's on

3   the fringes of Rhode Island and Massachusetts, that person

4   could actually be in Rhode Island; whereas, the database

5   might say they live in Massachusetts.

6          THE COURT:  Right, I understand that.  So I

7   understand that in the discovery -- at some point in the

8   process you might determine that, in fact, somebody's --

9          MR. CABLE:  Right.

10          THE COURT:  -- case should be dismissed, because

11   there's no venue here, and you might have to refile it

12   against them somewhere else.

13          MR. CABLE:  Correct.

14          THE COURT:  But is there any other information you

15   can define from the IP address as far as you know,

16   vis-a-vis, to determine the identity of the subscribe -- the

17   infringer or any other information you get?

18          MR. CABLE:  Yes.  We know what they call the

19   client or the software that is used to do the -- that the

20   person on the other end is doing the download or uploading

21   to us, so we can tell -- it's called "the client."  We can

22   tell what BitTorrent client they have, and we can tell what

23   version number.

24          This is helpful in figuring out what type of

25   operating system that they may have, what type computer that

1  they might have and other information that we can infer from

2  them.

3           THE COURT:  So you might be able to infer from --

4           So you also learn the particular brand, so to

5  speak, of BitTorrent client and the version number, and from

6  that it might be -- you might be able to infer whether

7  that's on a smart phone, a tablet, a computer, whether it's

8  operating Windows or which version of Windows --

9           MR. CABLE:  Right.

10          THE COURT:  -- or whether it's Mac OS and which

11  version of that.

12          MR. CABLE:  That's correct.

13          THE COURT:  Okay.  Anything else?

14          MR. CABLE:  From what I understand, no.

15          THE COURT:  So then what information -- what do

16  you need to know -- what do you need to acquire in order to

17  be in the position to file a motion to amend your compliant

18  substituting an actual person for any particular Doe?

19          MR. CABLE:  Well, I don't think there is a

20  specific set of information we need.  I think there's a

21  principle that is behind it.  I think we need a good-faith

22  basis to amend the complaint, and that can come in many

23  ways.

24          If I were to get a phone call from somebody

25  saying, "Hey, look, I did it, and I want to fight through

1 trial -- in court," that's a good-faith basis.

2          Whereas, if someone said, "Hey, look, I've never

3 used a computer before in my life.  I just like having

4 Internet at my house.  I don't use Internet.  It's just

5 something I want to do," I would not have a good-faith basis

6 to go after that person.

7          So anything that would give me a good-faith basis.

8          THE COURT:  Anything that would --

9          MR. CABLE:  And I --

10          THE COURT:  -- narrow the focus down --

11          MR. CABLE:  Yes.

12          THE COURT:  -- from the physical address --

13          The IP address which you don't yet know, but

14 presumably when you're done with the ISP, you'll have a

15 physical address associated with the IP address.

16          MR. CABLE:  That's correct.

17          THE COURT:  Anything that narrows -- any set of

18 information that narrows down the physical address

19 sufficiently with this other information to identify --

20          MR. CABLE:  Uh-huh.

21          THE COURT:  -- a person such that you have a

22 good-faith basis under Rule 11 to file a motion to amend.

23          MR. CABLE:  Right.  Right.

24          And I would argue the standard's just a little

25 higher.  I'd argue good-faith basis for a competent

1  attorney.

2          THE COURT:  All right.  So how does the --

3          The information you seek is the name and address

4  -- I understand the significance of that -- of the

5  subscriber, and the MAC address you're not sure whether

6  that's for merits down the road or whether that's for

7  identifying --

8          MR. CABLE:  Right.

9          THE COURT:  -- the infringer.

10         Then what's the plan?

11         MR. CABLE:  Well, I'd like to keep this as least

12 burdensome as possible and as least costly as possible.

13         Opening communications between me and the Does or

14 me and the subscribers is, I think, the best course of

15 action.  Sending a letter saying, "Hey, look, you know, your

16 Internet has been identified in infringing copyrights."

17         You know, anything that opens up this course of

18 discussion before going into more burdensome discovery like

19 depositions or things like that or examining devices and

20 things like that.

21         THE COURT:  So the problem and concern I have with

22 that --

23         Which essentially what you're saying to me is,

24 "What I'd like to do, Judge, is give me the name and

25 address..." -- or, "...the name, address, email and phone

1  number," --

2        But I'm not sure it really matters whether I give

3  you the email or phone number, because I imagine the name

4  and address they'll find the rest in about a minute.

5        "Judge, what I want to do is get that, and then I

6  want to go talk to people, and then I'm going to settle a

7  bunch of cases.  I'm going to get information.  We'll see

8  where the dust settles and whether I want to do that or not.

9  That's going to be a time-consuming process, the back and

10 forth, there's phone calls --"

11        MR. CABLE:  Right.

12        THE COURT:  "-- and so forth."

13        And the concern that I have is that when I read

14 the case law, *ex parte* discovery, which is what this is, *ex*

15 *parte*, This is *ex parte* and third party discovery, because

16 the discovery you're taking is not of parties to the

17 litigation.

18        MR. CABLE:  Right.

19        THE COURT:  At the moment everybody from whom you

20 seek discovery is a third party.  Both obviously ISP's a

21 third party.  At the moment I don't sense any possibility

22 that they're going to be named as defendants in this

23 litigation.

24        MR. CABLE:  Uh-huh.

25        THE COURT:  But even the subscribers at the moment

1 are third parties.  I understand that some -- that there's

2 some subscribers in the universe -- certainly given the

3 number of people Patrick Collins has sued -- that some of

4 those people the infringers are the subscribers.  And you

5 all could bicker over what the percentage is, but the fact

6 of the matter is at the moment none of them are defendants.

7           MR. CABLE:  Correct.

8           THE COURT:  The infringers are named.  They

9 haven't been identified as infringers.  They're wearing

10 their hat as subscribers, and that's the capacity in which

11 they're being addressed.

12           So it's *ex parte* discovery of third parties, and

13 the way I read the rules is that you need a plan under the

14 rules that will not guarantee you, but as a reasonable

15 likelihood or a reasonable possibility that at the end of

16 the discovery that I allow --

17           MR. CABLE:  Uh-huh.

18           THE COURT:  -- you will actually identify the

19 infringer --

20           MR. CABLE:  Right.

21           THE COURT:  -- and be able to file a motion to

22 amend.

23           MR. CABLE:  Uh-huh.

24           THE COURT:  And the concern I have with what you

25 propose is that the discovery I allow, it's a forgone

1 conclusion, it seems to me, that it won't identify the

2 infringer; that is, giving you the name, address.  With or

3 without the MAC of the subscriber isn't going to tell you

4 whether they're the infringer or not or who the infringer

5 is.

6            MR. CABLE:  Uh-huh.

7            THE COURT:  You need more information than that.

8            MR. CABLE:  Uh-huh.

9            THE COURT:  And the only other mechanism I

10 understand under the rules that would be available to you as

11 a matter of formal discovery would be a deposition either on

12 written questions or on oral questions, and is that

13 something you want or you don't want?

14            MR. CABLE:  I mean, if that's the only course,

15 yes.  But in terms of keeping costs down, in terms of just

16 keeping the expenditure of resources down, I wouldn't like

17 that obviously.  But we're willing to go that route if

18 necessary.

19            THE COURT:  I see.  All right.

20            I have another question.  Judge Stearns issued an

21 order to show cause.  I know you're familiar with it.  I

22 think he issued it on more than one case.

23            MR. CABLE:  Yes.

24            THE COURT:  But I read his order to show cause.  I

25 read your response to the order to show cause in the New

1  Sensations case you filed I think over the weekend.

2          In order to not create more work than is

3  necessary, can I --

4          And I've read Judge Young's opinion.

5          MR. CABLE:  Uh-huh.

6          THE COURT:  You've seen that.  Right?

7          MR. CABLE:  Correct.

8          THE COURT:  And I know Judge Saylor's issued the

9  order to show cause --

10         MR. CABLE:  Right.

11         THE COURT:  -- equivalent -- I think it's the same

12 as what Judge Stearns issued.

13         MR. CABLE:  Exactly the same.

14         THE COURT:  I don't know if the time has run on

15 that.  It hasn't.  All right.

16         Is there any reason --

17         Rather than me going through the exercise of

18 issuing an order to show cause, on that issue I think I

19 should at least consider the issue in light of what other

20 judges in this court are doing.  Can I simply -- if I wish

21 to address that issue -- treat your filing in New Sensations

22 as if it were filed in this case.  Say that, so that it's on

23 the record in this case, --

24         MR. CABLE:  Sure.

25         THE COURT:  -- and then if I want to address the

1  issue, I can address it rather than giving you two weeks to

2  file the same thing and go through the --

3          MR. CABLE:  Absolutely.  The only thing I'd like

4  to add --

5          THE COURT:  Certainly.

6          MR. CABLE:  -- is Judge Young --

7          I admire Judge Young very much.

8          The only thing I did not like about his order is

9  that he said that --

10          THE COURT:  Only one thing?

11          MR. CABLE:  Well, reasoning wise is that one of

12  the reasons for severing was potential course in settlement,

13  and that's something that I don't engage in.  And that's --

14          Other attorneys around the country do that; and,

15  you know, that potential thought of -- the idea there's a

16  potential for that, you know, and that being the reason for

17  severance really bothers me.

18          THE COURT:  Well, okay.  As to Judge Young's case,

19  you have to -- if you wish to bring that to his attention or

20  file a motion, whatever you want to do in his case, that's

21  on his case.

22          As to my case -- the cases before me, what I hear

23  you saying is, Judge, yes, you can consider what I filed in

24  the other cases, but here's an additional piece of

25  information that I want you to keep in mind which I will --

1 which is what you're saying is don't tarnish you with the

2 conduct of lawyers around the country --

3          MR. CABLE:  Right.

4          THE COURT:  -- that is not your conduct and don't

5 tarnish your clients with the conduct of other companies

6 around the country.

7          MR. CABLE:  Correct.

8          THE COURT:  To the extent that the Court is

9 concerned about that issue, judge that issue based on what

10 you've done in your cases and, to the extent that it's a

11 client issue, judge what your clients had done, but don't

12 hold them accountable for the actions of others for whom

13 they're not responsible --

14          MR. CABLE:  Right.

15          THE COURT:  -- or for who you're not responsible.

16          MR. CABLE:  Correct, correct, correct.

17          And beyond that, too, I think there's many methods

18 that we could use to adjudicate multiple Does in one case,

19 and I think there can be a lot of creative ideas --

20          THE COURT:  Have you ever tried a jury trial?

21          MR. CABLE:  No.

22          THE COURT:  So just to be practical here, --

23          MR. CABLE:  Right.

24          THE COURT:  -- you're never going to try 79 Does

25 together.  I mean, no judge in the United States is going to

1 let you have 79 Does in one case at trial, because it's

2 unwieldy.

3       There's no question that there are certain common

4 questions; the nature of the BitTorrent software, some of

5 the expert testimony.

6       MR. CABLE:  Uh-huh.

7       THE COURT:  And there is no question that those

8 Does that litigate -- and unless these cases are different

9 than all other cases, there's --

10       It's unlikely that a hundred percent of the claims

11 will go to trial.  Right?

12       MR. CABLE:  Right.

13       THE COURT:  Most cases don't go to trial and get

14 resolved at various stages along the way.

15       But the defenses of Does while they may -- there

16 may be a range of defenses that arise on a recurring basis,

17 the particular facts that support any individual Doe's

18 defenses will be individual to that Doe.

19       MR. CABLE:  That's right.

20       THE COURT:  And so whatever happens at a later

21 point in time in the cases --

22       MR. CABLE:  Uh-huh.

23       THE COURT:  -- is going to be determined, I think,

24 by every judge whether they sever all the cases as Judge

25 Young and Judge Stearns have done; or if they didn't, by

1 sort of the development of the case in thinking about how to

2 manage these cases in a practical way.

3          And frankly, if they're all severed and you filed

4 them all, if you --

5          Judge Young's case had, what, thirty defendants?

6          MR. CABLE:  I forget.

7          THE COURT:  And I think Judge Stearns had 200?

8          MR. CABLE:  201, yeah.

9          THE COURT:  201.

10          MR. CABLE:  Right.

11          THE COURT:  So if you turn around and file 200

12 more cases on those, at some point in time there's going to

13 be discussions with counsel properly about how to manage the

14 -- assuming they go into discovery and they proceed in the

15 ordinary course -- how to manage the discovery.

16          You're not going to have 200 Rule 16 conferences

17 before Judge Stearns, I wouldn't think, or 201 in each of

18 those cases.  I'm sure that he will figure out a way to

19 efficiently manage them and not -- you know, consolidate

20 them.

21          One Rule 16, because really the discovery client

22 in those cases once people appear will be very similar.

23          MR. CABLE:  Uh-huh.

24          THE COURT:  It might differ in an individual case

25 here and there, so there are a variety of mechanisms.

1          A question I have about severance as opposed to

2  joinder at this stage or trials often, but where it's not a

3  conclusive decision necessarily about trialing it away, why

4  can't --

5          One of the things you said in your memo in the New

6  Sensations case was, well, it's not practical to do

7  individual cases.  It's too expensive.  It's much more

8  burdensome.

9          But the question I have is why.  What's the

10  difference other than $350?

11          MR. CABLE:  That's the biggest thing.  Besides

12  that, it's me or whomever -- plaintiff's attorney -- having

13  to file all this paperwork, too.

14          And also on the Court I would presume.  I haven't

15  been a clerk.  I haven't been a judge.  I would presume that

16  also having multiple dockets and pulling everything together

17  would also be burdensome.

18          And practically speaking, a lot of these cases --

19  I was looking at the numbers last night.  A lot of the Does

20  in these cases either are dismissed or are settled in these

21  cases, and we're talking --

22          THE COURT:  Why are they dismissed when you

23  dismissed them?

24          MR. CABLE:  For various reasons.  A lot of times

25  it's because they settle, and a lot of times it's because we

1 don't think we can prove anything with this Doe.

2          THE COURT:  So when I see a dismissal, --

3          MR. CABLE:  Uh-huh.

4          THE COURT:  -- some of those dismissals are

5 because after you got the name and address, you and the Doe

6 subscriber had communications; and as a result of those

7 communications, you reached a settlement either with the

8 subscriber or with somebody else who might have infringed

9 through the subscriber's --

10          MR. CABLE:  Right.

11          THE COURT:  -- IP?

12          Have you ever reached a settlement with someone

13 other than the subscriber?

14          MR. CABLE:  Uh, yes, we have.

15          THE COURT:  Most of the settlements are with the

16 subscribers?

17          MR. CABLE:  Most are.  Sometimes they'll be a

18 subscriber that throws somebody under the bus, and we get an

19 affidavit or a declaration from that subscriber saying it

20 was, you know, XXX, that person; and that person will come

21 forward and either settle or choose to be the representative

22 of that downloading.

23          THE COURT:  I see.  And so a dismissal -- one

24 thing a dismissal could mean is a settlement.

25          MR. CABLE:  It could, yes.

1          THE COURT:  Are there any dismissals that mean

2    something other than a settlement?

3          MR. CABLE:  Yes.  In fact, I've had that happen

4    with Booth Sweet.  We can't prove that's this person.

5    There's just too much --

6          THE COURT:  What makes you come to that

7    conclusion?  Give me an example.

8          MR. CABLE:  The big thing is wireless routers.

9    There's many times when there's this -- there would be too

10   much discovery, and the clients feel that there's no

11   possible way besides spending gobs of money to figure out

12   who this person is.

13         THE COURT:  You mean -- so give me an actual

14   example of what kind of situation that would arise.

15         MR. CABLE:  Let's say you are a subscriber, and

16   you have a wireless router, and you know nothing about

17   BitTorrent.  You're not computer savvy at all.  You hardly

18   use a computer besides Skyping your grandchildren or

19   emailing.

20         THE COURT:  You're not entitled.

21         MR. CABLE:  Okay.  All right.

22         THE COURT:  Okay.  Go ahead.

23         MR. CABLE:  If that were the case with a couple of

24   other factors, --

25         THE COURT:  So you get the subscriber's name and

1  address.  You communicate with the subscriber, and the

2  subscriber has said to you, "I have a wireless router.  I

3  don't know what you're talking about when you say

4  'BitTorrent.'  I don't know what you're talk about Anal

5  Couple Swappers..."

6          MR. CABLE:  Right.

7          THE COURT:  "... your movie, and all I know is I

8  use my computer to check my email, or I go on Boston

9  dot-com, or I maybe Skype with somebody in my family or

10 what-have-you --"

11         MR. CABLE:  Right.

12         THE COURT:  "-- and I don't know what you're

13 talking about, and there are any number of family members or

14 household members who also use the wireless router."

15         MR. CABLE:  That's a factor that actually would go

16 the other way.  If there are family members, then we tend to

17 ask, "Okay, do you have a son who is 21 years old and is

18 very computer savvy?"  At that point --

19         THE COURT:  So what -- give me an example of one

20 you gave up on.  Don't tell me the name but what were the

21 facts and why.

22         MR. CABLE:  Very similar to what you said, except

23 no family members in the house.  Maybe an old lady who's

24 eighty years old that just has no clue what BitTorrent is

25 and just has a wireless router and --

1          THE COURT:  So your client concludes they don't

2  want to amend their complaint.  What you know is that --

3  what you believe is that IP address there was infringing

4  activity.

5          MR. CABLE:  Uh-huh.

6          THE COURT:  You talk to this person.  She says I'm

7  75 years old, I'm 80 years old.  I'm a woman, and I don't

8  know what you're talking about, and I'm the only one who

9  lives here.

10         MR. CABLE:  Right.  And we even ask do you have

11  neighbors.  Can you ask the neighbors if they might have --

12         THE COURT:  Do you ask whether it's secured or

13  unsecured?

14         MR. CABLE:  Every time, yes.

15         THE COURT:  And so what if she says it's secured?

16         MR. CABLE:  Then there's cause for concern.

17         People say, okay, my wireless device might be

18  hacked.  I typically don't believe that story and don't find

19  that as a reason --

20         THE COURT:  How many of dismissals are people were

21  non-settlements?

22         MR. CABLE:  I don't know.

23         THE COURT:  I mean as a percentage.

24         MR. CABLE:  I hate to make up percentages.  I

25  would say it's definitely in the minority, but there also

1 are settlements for zero dollars.  I would say --

2          THE COURT:  I mean, there can't be that many old

3 ladies who you've identified their IP addresses who live

4 alone with unsecured routers -- unsecured wireless routers

5 in apartment buildings.

6          MR. CABLE:  Ten, fifteen percent I would say.

7          THE COURT:  Other than the old lady example, is

8 there anyone else who you would dismiss without a

9 settlement?

10          MR. CABLE:  I mean, it's -- anyone who had similar

11 categorical facts.  It wouldn't be just an old lady.

12          THE COURT:  So basically it's if on the set of

13 circumstances the subscriber tells you there seem to be a

14 plausible possibility that, in fact, somebody else used

15 their wireless router and was the infringing person as

16 opposed to this subscriber or someone in the subscriber's

17 household, and you would -- you might dismiss, because the

18 effort that would be entailed to figure it out which

19 neighbor --

20          MR. CABLE:  Right.

21          THE COURT:  -- and to get third party discovery of

22 those people to try to do forensic analysis will be too

23 difficult if you could get it and too expensive to do.

24          MR. CABLE:  Right.  I had a UMass college student

25 the other day whose attorney called, and he said that there

1  was about twenty or so football players that frequent that

2  place, and he swore up and down that he didn't do it.  He

3  submitted an affidavit that he didn't do it.  And my trying

4  to figure out which football player or whomever might have

5  been at the residence downloading or uploading that file --

6           THE COURT:  At any given time.

7           MR. CABLE:  -- would have been near impossible.

8  Yes.

9           THE COURT:  I see.  Okay.

10          All right.  So the rest of the settlements, that's

11 the kind of situation that arises that might lead to a

12 dismissal.

13          And why are there zero-dollar-settlements?

14          MR. CABLE:  Just so that they have --

15          THE COURT:  Acknowledgement.

16          MR. CABLE:  Yeah.

17          THE COURT:  And that's just a question about

18 whether the --

19          So why -- come back to this.  Why can't -- other

20 than the --

21          So the filing fee, I understand that.  It makes it

22 more expensive.

23          MR. CABLE:  Uh-huh.

24          THE COURT:  But other than the filing fee, why

25 would -- what's the difference?  I mean, these documents are

1  all --

2          I haven't looked at the complaints in the other

3  cases, but I don't imagine they're really -- I imagine what

4  varies is a few sentences in Exhibit A.

5          MR. CABLE:  There's variances.  I mean, you can

6  definitely get software to automate documents, but the

7  uploading process is substantial, too.

8          THE COURT:  Okay.  So it's more time consuming to

9  file the documents.

10          MR. CABLE:  Right.  Right.  And those are the big

11  burdens, at least to me, that I know of.

12          THE COURT:  Once you've filed all the documents,

13  you serve more subpoenas.

14          MR. CABLE:  Uh-huh.

15          THE COURT:  Right?  Because instead of one

16  subpoena, you serve a subpoena per Doe.

17          MR. CABLE:  Uh-huh.

18          THE COURT:  But you could have your person serve

19  them all together.  There's no reason your service person --

20          Who does the service for you?

21          MR. CABLE:  It's part of my company, and sometimes

22  I do it, too.  It's just simply sending out a fax.

23          THE COURT:  All right.  So send them out.  If

24  you're sending out a fax, you could send out multiple faxes.

25          MR. CABLE:  Right.

1              THE COURT:  A little more time consuming.

2              MR. CABLE:  Well, and it also depends on each ISP.

3 Each ISP might have different protocols for how to handle --

4              They might treat one case different from multiple

5 cases that are all the same, so you might --

6              I might have an issue where they're saying, okay,

7 well -- and I'm just speculating.

8              I might have an issue where they say, okay, one

9 case is okay for us to do, but many cases is not; whereas,

10 and that one case is the same amount as many.

11             THE COURT:  What right do the ISPs have to decline

12 if the Court ordered it?

13             MR. CABLE:  None.

14             THE COURT:  I mean, are they telling you they're

15 not going to honor the subpoena?

16             MR. CABLE:  Yes.  They do say, "Well, we're

17 overwhelmed right now," and I get that all the time from

18 ISPs saying, you know, "There's only so much we can do, and

19 we feel like complying with police thick criminal subpoenas

20 are more important."  I get that all the time.  And just --

21             I guess beyond that, too, the paperwork would be

22 immense.  I don't know if ISPs would combine everything in

23 one envelope; but, you know, they may not.  There might be

24 thirty or forty envelopes in all which need to be scanned,

25 which need to be invoiced, so it just multiplies everything

1  -- It could multiply.

2           THE COURT:  Right.  All right.  Anything else on

3  that?

4           MR. CABLE:  Not now, but I'd like to reserve the

5  response --

6           THE COURT:  Sure, I'll let you respond after they

7  tell me.

8           MR. CABLE:  Okay.

9           THE COURT:  You don't have to reserve on that.

10          All right.  Let me see if I had any other

11 questions for you.

12          Oh, I do have another question.

13          You said with respect to Mr. Perkins' client

14 sometime ago -- I think in August in one of the -- I think

15 after he filed a motion to dismiss notwithstanding that I

16 had recommended that his client wasn't in the case, you

17 filed a response to that motion to dismiss.

18          MR. CABLE:  Uh-huh.

19          THE COURT:  And I think in that motion -- and you

20 attached some exhibits --

21          MR. CABLE:  Correct.

22          THE COURT:  -- with respect to both his client and

23 two other people in a different case that he had referred to

24 --

25          MR. CABLE:  Uh-huh.

1          THE COURT:  -- listing a variety of movies that

2 had been downloaded through those IP addresses and saying

3 that you were going to -- you were in the process of

4 amending the complaint -- filing individual actions, new

5 actions, individual actions -- against those three people.

6 Have you done that?

7          MR. CABLE:  No.  And I also have plans to do a lot

8 more than just that at least against individuals, and a lot

9 of it -- and I've spoken to counsel prior -- is that I'm

10 kind of waiting to see your response and the response of the

11 Court in terms of how to put protective measures into

12 protective of privacy and things like that considering it is

13 pornography.

14          For example, I'd like to be able to file under

15 seal if I'm going to be putting people's names on the record

16 or at least see how you feel about that, and so a lot of

17 these individual complaints I'm waiting to see the response

18 of the Court.

19          THE COURT:  All right.  So and is that why between

20 Mr. Booth or Mr. Sweet referred to a filing you made in one

21 of the other cases that you'll be filing new lawsuits

22 against individuals but they hadn't been filed?  It's the

23 same thing?

24          MR. CABLE:  Right.  And there was actually some of

25 those individuals who I had planned on filing against who

1  then settled with me.  I forget the exact number.

2          THE COURT:  And why would you be filing new

3  lawsuits as opposed to amending the complaints in these

4  lawsuits to identify Doe 22 the infringer is actually

5  whomever and replace that and then proceed with the case

6  with respect to whomever's left?

7          MR. CABLE:  Well, the fact --

8          Like you said earlier, the facts are different for

9  each case.  So as more facts arise, we have more, you know,

10 reason to put this person in this box, put this person in

11 that box.  So it's almost like we decide, okay, now --

12         THE COURT:  Is that a very persuasive argument for

13 by joinders inappropriate?

14         MR. CABLE:  Yes, it is.

15         THE COURT:  So why should I not do what Judge

16 Stearns and Judge Young did?

17         MR. CABLE:  Well, because at this juncture we're

18 all in it together; and we're, you know, trying to figure

19 out --

20         THE COURT:  So I understand why it's more

21 efficient --

22         MR. CABLE:  Right.

23         THE COURT:  -- in some ways to do it together, but

24 --

25         And I appreciate that your clients have copyrights

1  --

2          MR. CABLE:  Uh-huh.

3          THE COURT:  -- and stand differently than some

4  cases where people sued and didn't have copyrights.

5          MR. CABLE:  Uh-huh.

6          THE COURT:  But they have copyrights, and they're

7  entitled -- and think they are entitled to enforce their

8  copyrights.

9          But I have to follow the rules of civil procedure,

10 and what you're really telling me is that all this case is

11 is a vehicle to obtain pre *ex parte* discovery to try to

12 figure out who to sue, and then you're going to file

13 separate lawsuits.  Then why is joinder appropriate at all?

14         What you're really telling me is that given the

15 nature of these cases, what's going to happen is whose ever

16 left standing because either you didn't give up --

17         MR. CABLE:  Uh-huh.

18         THE COURT:  -- query the football player or the

19 old lady -- or they didn't settle in the course of this

20 process, whoever's going to litigate should be in separate

21 cases.  And so you're going to file new actions in separate

22 cases.

23         Why doesn't that say I should just sever all

24 these?

25         MR. CABLE:  Well, also the facts are extremely

1 different with Perkins.  His type of litigation style was

2 different from many others, and the clients have felt, you

3 know, let's have him in his own separate cases.  So, you

4 know, that's --

5         THE COURT:  You don't want everybody else getting

6 copies of Mr. Perkins files.

7         MR. CABLE:  Well, I'm sorry.  I will file judicial

8 notice, if necessary, to make sure there is an even playing

9 ground, but it was also a client's decision to do so.

10         THE COURT:  I mean, I have to say it gave me great

11 pause to read that having identified -- well, as to Mr.

12 Perkins' client have you identified --

13         I mean, if you filed a separate lawsuit, are you

14 going to name?  You don't have a person to name, do you?

15         MR. CABLE:  Right.  Right.

16         THE COURT:  You're just going to -- well, why --

17 you're just going to file -- your intent is to file a

18 lawsuit against Doe 22, if you will.

19         MR. CABLE:  Correct.

20         THE COURT:  And one lawsuit.

21         MR. CABLE:  Uh-huh.

22         THE COURT:  I see.  And then --

23         All right.  That seems to me given the way your

24 proceeding to be wholly inefficient.  If you're going to

25 proceed with these -- if your position is these questions

1 are common questions and they should be -- at least at this

2 initial --

3        MR. CABLE:  Uh-huh.

4        THE COURT:  -- discovery stage, and which we're

5 doing them together --

6        I'm not saying I agree with that, but if that's

7 your position, you shan't be carving out people --

8        You know, you can't be saying we're going to do

9 them all together unless we feel like we should do somebody

10 different because they're litigating alone.

11        MR. CABLE:  Well, there was also something

12 interesting about Perkins' case.  He had multiple -- his

13 client had multiple infringements which is not so much rare

14 but not common at all.  A lot of these defendants that we do

15 see only have this one movie in common; but whereas, --

16        THE COURT:  Had one movie, or had one movie in

17 common with the other people in the case?

18        MR. CABLE:  One movie in common with other people

19 in the case.

20        THE COURT:  Right.  But you don't know that he and

21 his client -- that through his client's IP address conned

22 the movies.  All you know is that through his client's IP

23 address more than movie was downloaded.

24        MR. CABLE:  Correct.

25        THE COURT:  Is it your position that most of the

1  people you sue only downloaded one infringing movie?

2          MR. CABLE:  No.  But also two --

3          THE COURT:  So how does that distinguish his

4  client?

5          MR. CABLE:  Well, also, too, the movies that were

6  downloaded were all from different production studios, so

7  the --

8          What's going to be filed against his client are

9  going to be fairly multiple plaintiffs in the case, so it's

10 not going to be --

11         There's not going to be one plaintiff like there

12 is here; there's going to be multiple plaintiffs.

13         THE COURT:  When you file that and you fill out

14 the civil cover sheet, are you going to say it's a related

15 case to this case?

16         MR. CABLE:  Yes.

17         THE COURT:  Why wouldn't you just amend in this

18 case and those other plaintiffs seek to intervene?

19         MR. CABLE:  I can if you'd like.

20         THE COURT:  Well, you have to make the decision

21 first.  I'm just --

22         MR. CABLE:  Right.

23         THE COURT:  -- trying to figure out what's going

24 on and why --

25         I'm not going to tell you how to litigate the

1  case, but I'm trying to figure out why you would be redoing

2  that.

3          All right.  Anything else?  I'll give you a chance

4  to respond to them, but anything else before I do?

5          MR. CABLE:  No, that's fine.  Thank you.

6          THE COURT:  All right.  Anything that any of you

7  wish to add?

8          MR. PERKINS:  Thank you, Judge.  So what Tony

9  Ulasewicz famously told Howard Baker and Sam Mervin, "Follow

10 the money."

11         THE COURT:  Tony who?

12         MR. PERKINS:  Tony Ulasewicz.  Do you remember the

13 Watergate hearings?

14         THE COURT:  Yes.

15         MR. PERKINS:  Tony Ulasewicz.  Maybe you're much

16 younger than me.

17         THE COURT:  I remember the hearings, but I don't

18 remember his name.

19         MR. PERKINS:  He said, "Follow the money."

20         My calculations are if you take the number of

21 settlements that Mr. Cable has done -- which is about 170

22 that he's announced to the Court -- and you subtract --

23         THE COURT:  He has 170 dismissals?

24         MR. PERKINS:  Yep.  And you subtract the fifteen

25 percent he's talking about which were no dollar settlements,

1 Mr. Cable if he's gotten his --

2          THE COURT:  I think the fifteen percent were

3 people who he gave up on, not no dollar settlements.

4          MR. PERKINS:  Right.

5          So even if you subtract 15 or 20 percent from the

6 settlements he's announced, Mr. Cable's collected over

7 $500,000 on behalf of his clients.

8          THE COURT:  You mean on the 2500 to 3500 hundred

9 dollar Web Act?

10          MR. PERKINS:  Yeah, there's actually 3500 to 4500

11 is what he's been demanding.

12          In any event, what we're talking about is some

13 very big numbers for someone who has yet to name a single

14 human being in place of a Doe.

15          And I think that we have advanced the discussion a

16 great deal with your questions today, and as I listened, I

17 came to the following conclusions which I think probably

18 mirror yours given what your questions were.

19          Number one, Mr. Cable is suing a lot of people and

20 asking the Court to give him basically a playground, a group

21 of names that he can call up and talk -- chat with, as he

22 described, about is it a grandmother who has no clue about

23 the Internet, is it a son who actually happens to be using

24 the parent's connection to do downloading, is it a roommate

25 or whatever.  And Mr. Cable with no supervision from the

1 Court on an *ex parte* basis with no individuals named as

2 defendants is out there basically mining this field.

3        He's trying to get as much money as he can before

4 the service date runs out or before everybody is severed or

5 before there's a dismissal of these cases.  And once that

6 field has been sown and reaped and you say, "I'm going to

7 sever or you run out of time to serve," then he's basically

8 going to give up.

9        And your questions illustrate exactly why he has

10 to give up.  No matter how well-intentioned Mr. Cable is --

11        And frankly, I find him a fascinating and

12 paradoxical person, because I think he's a likable human

13 being and a nice guy.

14        But the stuff he does is completely self

15 contradictory to the principles he's espoused.

16        As you pointed out with your questions and as Mr.

17 Cable laid out for us in great detail today, he never is

18 going to be able to find out who to name as a defendant

19 given the soliloquy or given the discussion you and he had

20 on July 30.

21        His position in this Court with the cases that are

22 before this Court -- and there's 34 of them in the District

23 of Massachusetts right now.  His position is I'm suing

24 infringers.  Subscribers are only third party informants.

25 They're potential witnesses.

1          And as you pointed out and as Mr. Cable has

2 acknowledged today, okay, let's walk down the road.  I let

3 you talk to these people.

4          What does Mr. Cable say he's going to do?  He

5 says, no, only very reluctantly would he ever do discovery.

6 What he really wants to do is to chat with them, and the

7 ones who he thinks that he can reach a settlement with, he

8 will get money from.  And he's never going to bother with

9 the others, because your questions have pointed out the

10 obvious point which is this:  When Mr. Cable gets the names

11 of the subscribers and he subpoenas them in for a

12 deposition, the cost of that alone in one or two cases is

13 impossible.

14          We all know as a practical matter that virtually

15 nobody is going to come in and say "I confess;" and if they

16 do, Mr. Cable may get some money from them but at a cost

17 which makes it completely impossible for him to sustain

18 these cases.

19          I mean, you talked about trying 79 cases together?

20 Mr. Cable is essentially a solo practitioner in Northampton.

21 There's no way in the world that he can do discovery and

22 actually proceed with these cases even to the point of

23 naming a defendant, much less getting to the point of trial.

24          So this entire enterprise is a sham.  It all ends

25 with who he talks with on the phone, who he gets a

1 settlement from, and then he moves on.

2          Now, there are some contextual facts which I think

3 you're well aware of but which we should put on the record,

4 because they haven't been discussed yet today; and that is,

5 that the 34 original cases that Mr. Cable brought are not

6 the only domain we're talking about.

7          As you pointed out, Mr. Cable has been promising

8 -- in my case for a month.  It was September 10 where he

9 dismissed my client and said I'm going to file an individual

10 lawsuit --

11          THE COURT:  But he dismissed --

12          MR. PERKINS:  What?

13          THE COURT:  Oh, he did file a notice of dismissal

14 of Doe 22.

15          MR. PERKINS:  Doe 22.  And then he said I'm going

16 to sue.  I'm going to go after --

17          THE COURT:  Your client is the subscriber.

18          MR. PERKINS:  Yes.

19          THE COURT:  He dismissed the infringer.

20          MR. PERKINS:  No, no.  He dismissed the case, and

21 the case is --

22          Right, it's a dismissal against the infringer.

23          But at the same time he said I am going to sue Doe

24 22 for downloading a dozen movies basically saying I know

25 Doe 22.  I have enough information about Doe 22 to file a

1 Rule 11 complaint -- Hash Rule 11, file a complaint against

2 Doe 22 --

3          THE COURT:  Are you planning to name the

4 subscriber as the infringer with respect to Doe 22, or are

5 you going to name somebody else as the infringer of Doe 22,

6 or are you just going to proceed against Doe 22 seeking to

7 identify who the infringer is?

8          MR. CABLE:  Well, all of the above, I would

9 presume.

10          THE COURT:  No, but right now.  If you were to

11 file an action -- a separate action today, is it going to be

12 against a person with a name, or is it going to be against

13 somebody identified as a John Doe?

14          MR. CABLE:  It's going to be somebody identified

15 as a John Doe.

16          THE COURT:  And you are going to want more

17 discovery in order to determine whether Mr. Perkins' client

18 who is the subscriber associated with Doe 22 is the

19 infringer or someone else.

20          MR. CABLE:  Absolutely.

21          THE COURT:  Okay.

22          MR. PERKINS:  Interesting point here, Judge.

23 Because, in fact, what Mr. Cable says -- and this is your

24 own logic that I'm pursuing -- he says I am going to sue an

25 infringer.  He says that today.  "I'm going to sue an

1 infringer who's downloaded twelve movies."  In fact, what

2 he's saying is I have an ISP address through which twelve

3 movies have been downloaded.

4         In the case of one of the defendants I will tell

5 you of the three that he mentioned in his dismissal motion,

6 she is a grandmother, she is clueless, someone did steal her

7 Internet connection; and that's why because there's some kid

8 next door who presumably has been doing this downloading,

9 there could be a dozen kids from the high school football

10 team downloading using her account.  Yet, Mr. Cable is

11 telling you with assurance in a filing in this court on

12 September 10 or 11, I'm going to be suing one individual who

13 is an infringer, and they used this IP address.

14         He doesn't know anything that would support a Rule

15 11 decision to sue, and that brings me to the most important

16 --

17         THE COURT:  Well, he's got a basis to sue the

18 infringer; he just don't know who it is.

19         MR. PERKINS:  Yep.

20         Now let me just get you in the rest of the context

21 which you're presumably aware of which is that while Mr.

22 Cable filed an original 34 cases between March and May of

23 this year and then filed no new cases against individuals or

24 otherwise, on September 16 he filed a whole new raft of

25 cases naming hundreds and hundreds of new defendants in

1 Massachusetts federal courts.

2         But there's a huge new characteristic to these

3 cases.  Mr. Cable has done a 180 from what he told you on

4 July 30.  Instead of saying I'm going to sue Does, and I'm

5 going to -- this is their -- he addresses the ISPs given

6 them.  But I'm really just going after the infringers, not

7 the subscribers.

8         Now Mr. Cable says the opposite.  In all the cases

9 he filed -- and there are five or six of them on September

10 16 -- Mr. Cable says there are theories of secondary

11 liability which will allow me -- which do allow me to sue

12 subscribers.  And in fact, the Does that I am suing in the

13 cases he filed September 16 are the infringers in his view,

14 because his view is it doesn't matter whether they're the

15 person who ran BitTorrent on a computer linked to this modem

16 or not.  If they are a parent whose child did it --

17         THE COURT:  The theory is the subscriber's

18 responsible for everything that happened through that pipe.

19         MR. PERKINS:  You got it.  That is the theory he

20 specifically disavowed before you for the 34 cases that are

21 pending now.

22         THE COURT:  Can you do that without a good-faith

23 basis of knowing whether or not the person knew about the

24 infringement?

25         MR. CABLE:  I believe so.  If there's constructive

1  knowledge that the person knew, there's also secondary

2  knowledge.

3          THE COURT:  So let me ask you this.  Suppose I'm

4  the subscriber on a land line telephone, and a guest comes

5  to my house and asks permission to use my land line phone to

6  make a call, --

7          MR. CABLE:  Uh-huh.

8          THE COURT:  -- and I say, "Go ahead."  And I'm

9  then not in the room, or you don't have any information as

10 to whether or not I'm in the room, because I don't know who

11 -- you have no information as to whether or not, you know,

12 -- whether or not I know who they called or what they did on

13 the call.

14         And while they made the call -- when they made the

15 call, they took their iPod which had bootleg music on it.

16 Right?  They played the music on their iPod, held it up to

17 the telephone, and on the other end of the telephone was

18 somebody who connected the phone to a speaker system in a

19 public venue or bar or restaurant.

20         That would be a copyright infringement of the

21 holder of that music.  Right?

22         MR. CABLE:  Right, yes.

23         THE COURT:  Would I be -- would you be able to sue

24 me for secondary liability for infringement, because I'm the

25 subscriber on the phone line?

1          MR. CABLE:  Well, in that circumstance it would be

2 -- it would be tougher.

3          But we're talking about files that are very large

4 in nature.  We're talking about files that about 2.5 gigs.

5 We're talking about not just one song.  We're talking about

6 an entire --

7          THE COURT:  What's the difference?

8          MR. CABLE:  Well, the difference is that they say

9 you're a subscriber of that telephone line, and you had that

10 guest come over and play the iPod.  They're playing an

11 entire concert.  They're playing three hours of music.

12 There's no way that you would not suspect something's going

13 on in that other room.

14          THE COURT:  You mean if they used my -- tied up my

15 phone for three hours?  How I would I even know if they were

16 using the Internet for three hours?

17          MR. CABLE:  I mean, there's different facts and

18 different circumstances for each --

19          THE COURT:  Right, but you need to have --

20          Well, it's not these three cases.  So I appreciate

21 the context, but at the moment at least at this hearing it's

22 not before me.

23          But it would seem to me that before you accuse

24 someone of copyright infringement, you'd need a basis to

25 believe they committed the -- some level of the requisite

1 acts that give rise to the infringement or have some level

2 of knowledge about it.  But that will be addressed in those

3 cases and those judges.

4　　　　　MR. PERKINS:  So, Judge, I did not actually raise

5 this context simply to point out that Mr. Cable is doing

6 something different in the new case than he did with your

7 case.

8　　　　　There is an important lesson.  You connect the

9 dots between the new approach and the old approach, and I

10 think we come to something that you were pointing out

11 earlier today.  "Follow the money."

12　　　　　Mr. Cable, as you'll recall when he stood before

13 you on July 30, really resisted the idea that a subscriber

14 wouldn't be liable under some secondary liability theory,

15 and you walked him back from that just as you've done again

16 today through a Socratic exercise saying this is

17 preposterous.  No one could believe that every subscriber is

18 secondarily liable no matter what the facts.  And Mr. Cable

19 acknowledged back on July 30, and nothing has changed since

20 then.

21　　　　　But under Rule 11, as you pointed out, you can't

22 possibly sue subscribers until you know more.

23　　　　　But what Mr. Cable wants you to do is to let him

24 have access to subscribers, because what he's going to do is

25 to say to them, the people who are unsophisticated and

1  unlettered in the law, he's going to say, "I have a theory

2  of copyright liability which says you're liable.  Pay me, or

3  else you're going to have to hire a lawyer.  I'm going to

4  sue you."

5          THE COURT:  So let me ask you both one quick

6  question, because then I do have some other hearings that I

7  have to get to.

8          I take it what your position is, Mr. Perkins, is

9  what I should do is deny, not allow any discovery.  And I

10  understand why you would oppose that, and I don't need to

11  hear from either of you about a thing unless there's

12  something very salient that you have about that.

13          Alternatively, let me just throw out to you one

14  thing that I've been ruminating about, and you can tell me

15  your prompt reaction but not for too long; and that is, why

16  shouldn't I whether it's one case or multiple cases before

17  me -- well, there's one defendant and multiple Does in the

18  case -- say you get the following process.  Plaintiff gets

19  to serve a subpoena on the ISPs.  The ISPs are ordered to

20  preserve the information.  They're ordered to serve on the

21  subscribers the subpoena and the Court's scheduling order.

22  Subscribers have a certain amount of time to object.  During

23  that -- at the end of that objection period then I have a

24  hearing as to anybody who objects.  During that period of

25  time no names are turned over whether or not somebody

1 objects.

2        At the end after I resolve whatever objections

3 there are, then I order the ISPs to turn over the name and

4 address on a certain date to Mr. Cable.  Mr. Cable then has

5 a brief period of time -- 21 days -- to take a one-hour

6 deposition of the subscriber.  After the one-hour deposition

7 he has a prompt 21 days period of time, something like that,

8 to file a motion to amend this complaint substituting the

9 name of person or persons he thinks are infringers in lieu

10 of the Doe who's identified.  And in any case, unless there

11 isn't such a motion filed, that Doe is the infringer -- that

12 Doe infringer is dismissed, because no discovery's

13 identified who the person is.

14        So my question is in that -- should I or should I

15 not do that scenario?  Does that address the various issues?

16        And if I did that, Mr. Cable, whether I did it --

17 whether I sever all these cases and you have one defendant

18 in each of these; and if not, if you file others -- if they

19 were before me, then I'd probably do the same.

20        Is that something your client would do, and is

21 that something you're willing to do; or I shouldn't do that,

22 and then Mr. Perkins.

23        MR. CABLE:  Yes.  Umm, but beyond, we might learn

24 something at the deposition, too, that might mean that we

25 need more discovery like examining the digital devices at

1 the home or residence or workplace, so there might be some

2 more discovery needed.

3          We're not trying to prove our case at the

4 beginning, but in terms of what we might -- we may not learn

5 anything at the deposition, so --

6          THE COURT:  Well, if you wanted more discovery,

7 you'd have to file a motion for why there was good cause --

8          MR. CABLE:  Right.

9          THE COURT:  -- to establish specifically as to a

10 particular person, this is why, and this is what, and the

11 discovery's reasonable and focused on identifying who the

12 infringer is; not on the -- not on the merits.

13          MR. CABLE:  Right.  And also, too, I would request

14 that stuff be filed under seal until we're absolutely sure

15 who --

16          THE COURT:  I probably were -- Given the Cable

17 Privacy Act that you'd have to -- you couldn't name the

18 person publicly until the Court approved the motion to

19 amend.

20          But the concern I have is sort of there's a

21 shifting sand throughout here about all of these cases and

22 what's going on.  I mean, I certainly would not be allowing

23 you through the Court to send a letter of any type to these

24 people.

25          If you contact them on your own, that's on your

1 own.

2        But the first letter was just unacceptable, the

3 one that I -- as a result of that quash.  I would not

4 approve the letter I've seen.  I'm not approving that

5 letter.  I'm not going to allow you to send that letter.

6        If you send that letter, you send that on your

7 own.  It's not going under -- it's not going with a

8 court-ordered subpoena.

9        And but there are people out here --

10 notwithstanding your various protestations at time -- who

11 claim they're innocent subscribers and who didn't do this,

12 and I've seen nothing to date to establish the second either

13 as a matter of law or a fact as to any person before me that

14 a subscriber is secondarily liable for the acts of people

15 using their Internet service, at least where there aren't

16 facts that establish that they know what the person was

17 doing with their Internet access.

18        Now that's just on what I've heard, but I don't

19 have to rule any more than what's before me.

20        And I do have some --

21        I mean, I'm hesitant to do what I think Mr.

22 Perkins and the other defense counsel want me to do, because

23 it essentially means your clients can't enforce their

24 copyrights as a practical matter.

25        But at the same time, you know, there are rules to

1 be followed, and --

2        Anything you want to add, Mr. Perkins, or other

3 defense counsel?

4        MR. SWEET:  Yeah, briefly, Judge.

5        THE COURT:  One minute.

6        MR. SWEET:  Your proposal is one that obviously

7 tries to take the copyright laws and the role of the United

8 States Court and make Mr. Cable follow those rules.

9        My concern is this.  If, as everyone who does

10 these cases has been pointing out for years now, the goal of

11 the copyright holders is to have informal discussions with

12 the subscribers so they can convince them to pay them money

13 and settle the cases, then you're still allowing that window

14 to occur.

15        And what I'm concerned about is this.  Mr. Cable

16 gets his list.  He sends out his deposition notices and his

17 subpoenas to the subscribers who are witnesses.  If he is

18 allowed then to have informal discussions with the

19 subscribers, we're essentially doing nothing more than what

20 he's already asking you to do, give me a subscriber list --

21        THE COURT:  How can I prohibit --

22        I mean, in every case there's pre suit settlement

23 discussions, there's post suit settlement discussions.

24 You're essentially saying I should be prohibiting him from

25 engaging in that kind of informal resolution of cases.

1              MR. SWEET:  And that's an excellent point, because

2  of course basically plaintiffs should be entitled to consult

3  with defendants once they have their identity as potential

4  defendants and say do you want to settle this case instead

5  or not.

6              And I think the best answer I can give you is the

7  reason why the Court should monitor this and prevent Mr.

8  Cable from engaging in those kinds of informal discussions

9  is because there are now at least six years and pushing a

10 half a million cases where it's become clear that the goal

11 of copyright holders is to have these informal discussions

12 and to sucker people into paying.

13             And in fact, you've seen the evolution of Mr.

14 Cable in front of you.  You know, July 30 he's telling you

15 Rule 11 says I can't possibly go after these people until I

16 know more.  He's now filed.  Hundreds and hundreds of

17 defendants are now being sued saying, "No matter what,

18 you're liable under a secondary liability theory."

19             And if the current Mr. Cable has the opportunity

20 to speak without court supervision with people he's

21 subpoenaed into depositions --

22             Who I can tell you we all know they're going to

23 call up and say, "Do I really need to come?  Can't we work

24 something out?"  Even if they're innocent, they're going to

25 do that.  They don't want to come in and answer questions

1  under oath in Mr. Cable's office.

2          Unless the Court is involved in supervising that,

3  you're basically without actually sending out a false notice

4  still participating in the scheme.

5          THE COURT:  All right.  Oh, one thing I want you

6  to do, Mr. Cable, by -- if you can do it within seven days,

7  by next Friday, I'd like you to give me a supplemental

8  filing about what the significance of a MAC address is.  Why

9  you need it, what it would do, what does it go to, and is

10 there any -- and to the extent there's something other than

11 what you described today that you've already learned that

12 might -- that you learned in the process, what is it, and

13 how does that relate, if at all, to identifying the

14 infringer.

15         All right.  We're adjourned.  Thank you very much.

16 I'll take it under advisement.

17         THE CLERK:  All rise.

18     (Court adjourned at 11:10:28 a.m.)

19

20

21

22

23

24

25

64

1                           CERTIFICATION

2         I, Judy Bond Gonsalves, a court approved transcriber,

3    certify that the foregoing is a correct transcript from the

4    official electronic sound recording of the proceedings in

5    the above-entitled matter.

6

7

8    _____  October 22, 2012
     Judy Bond Gonsalves
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25